# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

SCOTT HUTLEY, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC,

        Defendant.

Case No. 22-cv-00902

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Scott Hutley brings this class action lawsuit against Harley-Davidson Motor Company Group, LLC ("Harley-Davidson", "Harley", or "Defendant") on behalf of himself and the proposed Rule 23 Class (defined below) for damages. Plaintiffs make the following allegations based on actual knowledge as to their own acts, and information and belief and the investigation of counsel as to all other matters.

## NATURE OF THE ACTION

1. This is an antitrust action directed at Harley-Davidson's anticompetitive conduct: Harley-Davidson used its warranty to try to force Harley owners to use its own parts, rather than the many quality aftermarket parts available for its motorcycles.

2. Harley-Davidson's use of its warranty in this manner violated the Magnuson-Moss Warranty Act and the Federal Trade Commission Act, as charged by the Federal Trade Commission ("FTC") and admitted by Harley-Davidson in its acceptance of the consent decree it entered with the FTC on June 22, 2022.

3. Harley-Davidson is one of the oldest and most recognizable vehicle brands in the world. The company was founded in 1903 and accounts for approximately half of all roadgoing motorcycles with engine displacements in excess of 601cc.

4.     Because of the longevity and popularity of its motorcycles, and because of customers' willingness to customize and/or keep older Harley-Davidsons on the road for many years, there is a vast aftermarket for parts to repair and customize Harleys.

5.     The aftermarket for Harley-compatible parts became a threat to Harley-Davidson's bottom line. Harley-Davidson makes approximately 15% of its annual revenue from parts. In order to maximize its parts revenue and profit, Harley-Davidson used its warranty to try to suppress competition from aftermarket parts competitors and to force Harley owners under warranty to use only Harley-Davidson's own parts.

6.     Harley-Davidson illegally tied its own branded parts to its motorcycles (and the factory warranties that go with them). As a result, Harley-Davidson has lessened competition in the market for Harley-compatible replacement parts. This has allowed Harley-Davidson to charge supracompetitive prices for its parts, at the expense of the consumers who buy them.

7.     The FTC's consent decree with Harley-Davidson obtained injunctive relief to put a stop to at least some of Harley-Davidson's illegal business practices. The FTC, however, lacks the authority to recover consumers' damages. In this litigation, Plaintiffs seek to recover those damages—the overpayment for Harley-brand parts—from Harley-Davidson for the proposed consumer Class.

## THE PARTIES

8.     Plaintiff Hutley is a resident of Jamestown, New York. He purchased a Harley motorcycle from Harley-Davidson of Jamestown on July 9, 2020. Mr. Hutley purchased Harley-Davidson-brand parts on April 6, 2021, from Harley-Davidson of Jamestown for his Harley motorcycle.

9.     Defendant Harley-Davidson Motor Company Group, LLC, is a Wisconsin limited liability company with its principal place of business located at 3700 W. Juneau Ave.,

Milwaukee, Wisconsin. Defendant also maintains factories in York, Pennsylvania; Milwaukee, Wisconsin; and foreign locations including Brazil, India, and Thailand.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2)(A), because there is more than $5 million in controversy (exclusive of interest and costs) and there is minimal diversity.

11.     Defendant is subject to personal jurisdiction in this District because Defendant purposefully availed itself of the benefit of doing business in New York, including this District, by selling its products in interstate commerce to New York and this District—where Plaintiff's purchase of Harley-brand replacement parts (and resultant antitrust injury) in fact occurred.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred.

## BACKGROUND

### A.     <u>Harley-Davidson Motorcycles</u>

13.     Harley-Davidson Inc. was founded in Milwaukee, Wisconsin in 1903. By 1920, Harley-Davidson was the largest motorcycle manufacturer in the world. Along with Indian Motorcycle Inc. ("Indian"), Harley-Davidson is one of only two American motorcycle brands to have survived the Great Depression.

14.     In the 1970s, Harley-Davidson faced waning popularity and near-bankruptcy in the wake of cost-cutting measures that resulted in low-quality bikes, as well as the introduction of the so-called Universal Japanese Motorcycle ("UJM") – a new category of very similar, accessible motorcycles manufactured by the big four Japanese motorcycle manufacturers -- Honda, Kawasaki, Yamaha, and Suzuki; which appealed to American consumers.

15. In the 1980s, Harley-Davidson turned around its business and restored its status and image. It did so via its adoption of the large-displacement bicycle, helped expeditiously by the Reagan administration's tariffs against foreign imports of this kind of model. This kind of motorcycle was easily distinguishable from the UJM, creating a whole new separate category of bike predominated by a single manufacturer whose brand now became shorthand for the American motorcycle.

**B.     Harley-Davidson's Warranty**

16. As of June 2022, Harley-Davidson sold as a bundle with its motorcycles warranties valid for twenty-four months, "starting from the earlier of (a) the date of the initial retail purchase and delivery of the motorcycle from an authorized Harley-Davidson dealer; or (b) the third anniversary of the last day of the model year of the motorcycle." *See* Complaint, *In re Harley-Davidson Motor Co. Grp., LLC*, No. 2123140 ("FTC Complaint"), available at https://www.ftc.gov/system/files/ftc_gov/pdf/2123140HarleyDavidsonComplaint.pdf.

17. Harley-Davidson's 2021 warranty stated, in relevant part, that:

- "Genuine Harley-Davidson parts are engineered and tested specifically for use on your motorcycle. Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact."

- "This limited warranty will not apply to any motorcycle ... 1. Which has not been operated or maintained as specified in the owner's manual... 4. Which has off-road or competition parts installed to enhance performance, a trailer hitch, or has other unapproved modifications (even if these modifications include genuine Harley-Davidson parts and accessories that are not approved for use on your motorcycle). These modifications may void all or parts of your new motorcycle limited warranty. See an authorized Harley-Davidson dealer for details."

- The "[u]se of aftermarket performance parts may void all or parts of your limited warranty. See an authorized Harley-Davidson dealer for details" and that "the use of parts and service procedures other than Harley-Davidson approved parts and service procedures may void the limited warranty."

- In "[s]ome countries, states or other locations may require all regular maintenance and service work to be done by an authorized Harley-Davidson dealer for your

warranty to remain in effect. Check with your local Harley-Davidson dealer for local requirements."

**C.** **Warranty Coverage**

18.     Even when customers have endeavored to obey Harley-Davidson's dictate that they only choose Harley-Davidson branded compatible parts, they still risk losing warranty coverage, which the company seeks to limit even beyond the scope of its language.

19.     For example, according to comments in public forums, consumers have experienced situations where their dealers record and report repairs that ought to be covered by their warranty as non-warranty repairs, claiming that the customer has impermissibly altered their bike by performing modifications unrelated to the issue for which the customer has brought in their bike,[1] including simply mounting a flag.[2]

20.     Harley incentivizes the dealers to do this by structuring repair reimbursements – which reportedly can be up to 30 cents on the dollar – differently depending on whether they are reported as covered or not. Repairs will get reimbursed immediately for uncovered repairs, but for warranty repairs, dealers must wait up to ninety days to be compensated.[3]

21.     By incentivizing the dealers to void warranties, thus "flipping warranty situations into non-warranty situations,"[4] Harley-Davidson is able to profit in two ways – first, by dodging the repair labor cost, and then making the part into revenue.

---

[1]  Harley Davidson Warranty Fraud Update with Rider Reactions, https://youtu.be/eIxCLZl5I7M at 6:40 (discussing comment by individual identified as Jim Redmond) (last visited Nov. 17, 2022).

[2]  *Id.* at 6:30 (discussing comment by individual identified as Tim Barnett) (last visited Nov. 17, 2022).

[3]  *Id*. at 8:20.

[4]  *Id.* at 9:20.

### D. The Parts Universe

22. The parts at issue in this suit are those compatible with Harley-Davidson bike models ("Compatible Parts"). Because Harley monopolizes the large American-manufactured motorcycles market, such parts generally refer to those compatible not only with Harley motorcycles but also with large cc American motorcycles in general. One notable differentiator between Harley Compatible Parts and other parts (e.g., those compatible with Japanese motorcycles) is the use of imperial or SAE units as opposed to metric units.

23. Many manufacturers make and sell motorcycle parts, including Compatible Parts. Various online retailers, for example, have sections specifically labeled as Harley-Davidson compatible under which both Harley-branded and third-party-manufactured parts are sold. Such third-party parts, which may often be priced lower than Harley-branded parts, are a direct threat to the revenue that Harley enjoys from its parts segment – a threat that Harley has scrambled to control through its unlawful, anti-competitive tying scheme.

### TRADE AND COMMERCE

24. Harley sells motorcycles and parts in the United States through the flow of interstate commerce, including through and into this District. Harley's annual revenue exceeds $5 billion dollars, and it is the largest maker of motorcycles for the U.S. market, including roughly a majority of roadgoing motorcycles with engine displacements over 601cc.

25. Harley's business activities were intended to have and have had a substantial effect on interstate trade and commerce in the United States, including in this District. Harley's business activities also had a substantial effect on intrastate commerce in New York and the other states throughout the country. There are Harley-Davidson motorcycles registered and on the road in all fifty states and the District of Columbia. These motorcycles are frequently customized and will eventually need repairs.

6

26.     Third parties make numerous repair parts and performance and cosmetic upgrade parts for Harleys. Despite this, Harley-Davidson has kept a larger share of the parts market for itself, and commanded higher prices for its repair parts, because it has used its warranty to unlawfully force Harley owners to use its own branded parts.

## RELEVANT MARKET

### A.     The New Market For American-Made Large, Roadgoing Motorcycles

27.     There are two relevant product markets in this instance. The first is the market for motorcycles, specifically American-made, new, large roadgoing bikes, which are sold as a bundle with factory warranties. This is the "tying market" over which Harley-Davidson has market power.

28.     The second relevant product market is the market for Harley-Davidson Compatible Parts. Compatible Parts are distinguishable from parts for other brands of motorcycle by their technological compatibility. This is the "tied" market into which Harley-Davidson has captured increased market share and charged supracompetitive prices by using its leverage in the tying market, including in particular its warranty that does not allow owners of new Harleys under warranty to purchase competitors' brands of Compatible Parts without the risk of voiding their warranties.

29.     Large, roadgoing motorcycles are a separate product market from non-roadgoing motorcycles, and likewise American-made motorcycles are a separate product market from non-American made motorcycles. American-manufactured, large roadgoing motorcycles thus constitute their own separate product market.

30.     Roadgoing motorcycles are registered with the Department of Motor Vehicles in the state where the owner resides, and they can be ridden on the road. motorcycle that cannot be registered cannot be legally ridden on the road, and for that reason is not a substitute. Dirt bikes, for example, are suitable only for off-road use, serve a different function to their riders and so

constitute a different market. Prices of dirt bikes thus do not discipline the price of large roadgoing motorcycles, and vice versa.

31.     Nor do small displacement motorcycles constitute part of the same market as large, roadgoing motorcycles. Harley-Davidson makes no roadgoing bike with an engine displacement smaller than 883cc. Smaller displacement engines are almost universal in dirt bikes, and common in certain kinds of road bikes, including sport bikes, a market dominated by smaller Japanese motorcycles. Smaller motorcycles, however, lack the passenger and cargo capacities of large roadgoing motorcycles, lack the torque and horsepower that only a larger engine can offer, and lack the look and feel of large roadgoing motorcycles. For this reason, they attract different buyers than small displacement motorcycles. Thus, the prices of smaller bikes do not discipline the prices of large roadgoing motorcycles, and vice versa. Harley has in fact recognized the separateness of large roadgoing motorcycles in its public reporting, in which it defines its own market share by roadgoing motorcycles with engine displacement larger than 601cc.

32.     New, large roadgoing motorcycles are sold as a bundle with manufacturer's warranties. Manufacturers' warranties are neither useful nor available without the motorcycle they cover. The availability and terms of manufacturer warranties distinguish new large roadgoing motorcycles from used large roadgoing motorcycles.

33.     Consumers have difficulty understanding the lifecycle pricing of a motorcycle. The need for replacement parts is difficult to forecast for any given motorcycle because the need for replacement arises from damage or wear events that are hard to predict, and because the owner has purchased a warranty to defray these costs if they purchased a new Harley-Davidson motorcycle.

34.     American-made motorcycles are distinguishable from non-American motorcycles, even within the aforementioned category of large, roadgoing bikes. They are a discrete submarket that does not experience cross-elasticity of demand with, for example, Japanese-

manufactured large, roadgoing, motorcycles. Indeed, American-made motorcycles – both Harley and its smaller competitors in this space – enjoyed their own dedicated publication for thirty years with American Iron Magazine, thereby demonstrating that there was a distinct ridership and following for American-made motorcycles, sufficient to support its own universe of print media.

35.     In contrast to other kinds of vehicles, like cars, for example, motorcycles elicit a specific kind of cultural commitment from their consumers. Motorcycle riders routinely form organizations centered around shared homes and/or cultural heritage, and the bikes that they ride frequently serve as vehicles to express their patriotism. Indeed, Harley-Davidson offers a variety of American flag kits and other kinds of patriotic memorabilia that can be attached to their motorcycles or worn by riders. The consumer base of Harley-Davidson would find it incongruous with their belief structure to ride a Japanese make of bike, even if such a motorcycle was for all intents and purposes the same thing as Harley's version and similar or cheaper in price.

36.     The company's loyal consumer base is organized into the so-called "Harley Owners Group," or "HOG" – a Harley-sponsored fan club (the logo of which includes a bald eagle) that seeks to brand Harley-Davidson as a distinctly American icon, specifically to appeal to an all-American fan base seeking to celebrate via their motorcycles a shared national heritage.[5] Harley-Davidson consciously created and invited this all-American branding as part of its 1980s comeback in its effort to distinguish itself from the increasingly popular Japanese motorcycle. As an American-based, American-manufactured brand, it was able to capture new consumers to the world of motorcycling that would not have otherwise joined.

---

[5]     Jerry S. Wilson et al., *Managing Brand You* 36 (2008), available at https://books.google.com/books?id=L5QgZxUgVkYC&pg=PA36#v=onepage&q&f=false (last visited Nov. 17, 2022).

37.     One study of Harley riders found that the group qualified as a "subculture of consumption," or "a distinctive subgroup of society that self-selects on the basis of a shared commitment to a particular product class, brand, or consumption activity."[6] The study showed how this burgeoning class of riders, bolstered by Harley's own marketing efforts and establishment of its so-called Harley Owners Group, centered around Harleys as a distinctly American form of bike. Harley enthusiasts would only purchase Japanese motorcycles as a stopgap measure because Harleys are significantly more expensive. While other American brands such as Indian do figure in this market, Harley's scale dwarfs these competitors and is thus the most visible choice to these consumers who will only ride American.

38.     If a Harley motorcycle is totaled, or breaks down beyond repair, the owner will not shop around for its replacement – they will rather buy another Harley. While some niche American-made alternatives, like Indian, do exist, only Harleys elicit the prestige and cache of a distinctly American heritage brand. Their presence dwarfs any other American brand in the market, with their nearest competitors in terms of market size being the so-called "Japanese Big Four" (Honda, Kawasaki, Yamaha, and Suzuki), and then the German BMW. Other American brands are comparatively unknown and do not figure in the general awareness of the American biking community. Harleys, moreover, can be bought in an abundance of colors, makes, and configurations.

### B.     The Compatible Parts Market

39.     The Compatible Parts market is defined by compatibility with Harley-Davidson motorcycles. To repair a Harley-Davidson motorcycle, the owner must purchase a Compatible

---

[6] John W. Schouten & James H. McAlexander, *Subcultures of Consumption: An Ethnography of the New Bikers*, 22 Journal of Consumer Research, Inc. 43 (June 1995).

Part. The prices of parts that are not compatible with Harley-Davidson motorcycles cannot and do not discipline the prices of parts that are compatible with Harley-Davidson motorcycles.

**C.    Geographic Markets**

40.    The United States is the relevant geographic market for both large roadgoing motorcycles and parts.

41.    Harley-Davidson distributes its motorcycles throughout the U.S. through a network of independently-owned, authorized dealerships.

42.    Harley-Davidson also distributes Compatible Parts throughout the United States through its dealer network as well as via its online website.

**D.    Barriers to Entry**

43.    There are significant barriers to entry in both relevant markets that allow Harley to protect and maintain its market power. The first is technical and regulatory. Motor vehicles for operation on public roads are complex and heavily regulated machines. Engineering a new make of large, roadgoing motorcycle from scratch is an expensive engineering challenge, requiring formidable economic backing. Effective entry into the relevant markets would require developing expertise in design engineering in addition to obtaining certifications and approvals necessary to U.S. road registration, including for safety and emissions.

44.    Even a new entrant with the engineering expertise could have no guarantee of success because of the importance of brand identity in the market. Harley-Davidson has a 119-year-old brand. Because of the importance of brand heritage in large, roadgoing motorcycles, most new entries by American and even British makers have been revivals of pre-WWII brands, including American names Henderson (which failed after two years), the aforementioned Indian (backed by offroad giant Polaris), and, among British marques, Triumph. There are only a

limited number of available defunct American motorcycle brands that have names that would still resonate among potential customers today.

45. A new entrant would also need to secure distribution, contending with the legal restrictions many states place on road vehicle dealerships and with the existing dealer networks that could not afford to alienate their suppliers.

46. The capital outlay necessary to secure a recognizable brand or build one from scratch, to design and market a new motorcycle, and secure nationwide distribution, are very formidable. Most major motorcycle makers in the U.S. other than Harley-Davidson (with its venerable brand and fanatical following) have the backing and name of companies with an array of products in markets across the globe. A new entrant to displace Harley-Davidson's dominance would need to be prepared to bear a large initial investment and keep that capital at risk for a protracted period to build the name necessary to become sustainable and profitable.

47. Harley-Davidson's own conduct challenged herein created a barrier to entry into the Compatible Parts market. Harley-Davidson's conditioning of its warranty on the use of Harley-Davidson parts provided a powerful disincentive to dealers stocking and riders choosing competing Compatible Parts. A new entrant would have to contend with a robust supply of Compatible Parts, which are typically sold to Harley owners who were not covered by manufacturer warranties or intended to void them.

## HARLEY'S MARKET POWER

48. Harley-Davidson has substantial market power in both relevant markets. It has obtained market power in the tied market for Compatible Parts by leveraging its market power in the tying market, including its illegally restrictive warranty, to force consumers whose Harley motorcycles are under warranty to purchase its own branded parts or risk voiding their warranties.

49.     Harley-Davidson has a monopoly in the market for large roadgoing motorcycles. Its market share in this market, according to its own public reporting, is 44.5%.[7] The remainder of the market is fragmented, and the next four firms in market share are the Japanese Big Four.

50.     Harley-Davidson also possesses substantial market power in the market for Compatible Parts. Its next closest competitor, parts seller Custom Chrome, has an annual revenue of approximately $21.2 million[8] while Harley's revenue for parts in 2021 equaled approximately $741.8 million.[9]

51.     In its February 2022 guidance, as published in its 2021 10-K, Harley-Davidson stated that it expected "revenue growth from parts and accessories and apparel and licensing" and that "***growth in revenue from higher-margin parts and accessories*** and apparel, will more than offset the expected cost inflation across the supply chain" (emphasis added).[10]

## HARLEY'S ANTICOMPETITIVE TYING CONDUCT

52.     To maintain its dominant position in the market for parts, Harley uses its monopoly power in the large, roadgoing American motorcycle market (and specifically the manufacturer's warranty bundled with the new bike) to coerce customers not to purchase Compatible Parts from its competitors. Until Harley-Davidson entered its consent decree with the FTC in June 2022, it did this by unlawfully tying its warranty to its parts by requiring customers who bought its bikes to only use Harley-Davidson's Compatible Parts – or else risk voiding the warranty. This is illegal under the Magnuson-Moss Warranty Act. In June 2022, the FTC ordered Harley to stop this

---

[7]   As reported in the company's 10-K for the year ending Dec. 31, 2021, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/793952/000079395222000014/hog-20211231.htm.

[8]   https://www.datanyze.com/companies/custom-chrome/28581444 .

[9]   *Id.*

[10]   *Id.*

practice going forward, but it did not (and lacks the authority to) recoup the past overpayments for parts from all affected Harley owners.

53.     Harley-Davidson's anticompetitive conduct has allowed it to charge more for its parts than it would have been able to, had it limited its warranty terms to what the law allows. Further, Harley-Davidson's riders have been deprived of access to the full range of aftermarket parts that the market could support. While there is a market for parts that competitors participate in, Harley owners whose bikes were under warranty were not free to choose from that array of parts because the choice to use competitor parts came with the threat of loss of warranty coverage, which warped the market dynamics and enabled Harley-Davidson to charge supracompetitive prices that are paid by all purchasers of Harley-Davidson branded parts.

## INJURY TO COMPETITION

54.     Harley-Davidson's anticompetitive practices in tying its own branded parts to its motorcycles and warranties through the restrictive warranty provisions have restrained trade, and have preserved and entrenched Harley-Davidson's market power. Harley-Davidson's conduct has injured competition in the market for parts and has caused injury to owners in the form of anti-competitive pricing for parts.

55.     The injury to competition has caused injury to its competitors, as well as antitrust price injury (i.e., supracompetitive prices) to its direct customers. Through those direct purchasers who resell Harley-Davidson Compatible Parts, that antitrust injury is then passed through the chain of distribution to consumers who own Harleys and purchase Compatible Parts. Harley motorcycle owners have paid higher prices for parts because of the tying.

56.     Harley-Davidson's tying was unlawful under the Magnuson-Moss Warranty Act. It had and could have no legitimate business or pro-competitive justifications, because it was unlawful.

14

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the proposed Class, and alternative state Subclasses, defined below. Unless otherwise specified, these are referred to collectively as the Class.

> All owners of Harley-Davidson roadgoing motorcycles who indirectly purchased Harley-Davidson Compatible Parts from six years before the filing of this Complaint until the anticompetitive effects of Defendant's conduct cease (the "Class Period") in any of the Indirect-Purchaser Jurisdictions specified below.

> Excluded from the Class are Defendant, its parent companies, subsidiaries, and affiliates; federal government entities and instrumentalities of the federal government; states and their subdivisions, agencies, and instrumentalities; and all judges and court staff assigned to this matter.

58.     The Class is so numerous that joinder of all members would be impracticable. While Plaintiff does not know the exact number of Class members, on information and belief, there are thousands of Class members.

59.     Common questions of law and fact exist as to all Class members. Defendants' conduct was generally applicable to all Class members, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.     Whether Defendant possesses market power in the market for large, American, road-going motorcycles;

b.     Whether Defendant possesses market power in the market for Compatible Parts;

c.     Whether Defendant acquired or maintained market power in the market for Compatible Parts by anticompetitive conduct, including its illegally restrictive warranty;

d.     Whether Defendant coerced consumers who own Harley motorcycles to purchase its own branded Compatible Parts (e.g., through its illegally restrictive warranty);

e.     Whether Defendant's conduct caused antitrust injury to consumers in the form of supracompetitive prices;

f.     Whether Defendant's conduct violated the state antitrust laws alleged in this Complaint;

g.     Whether Defendant's conduct caused Class members to pay supracompetitive prices for Compatible Parts;

h.     The appropriate relief for Class members, including the measure of damages.

60.     Plaintiff's claims are typical of the claims of the absent Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class were similarly affected by Defendant's wrongful conduct in that they all paid supracompetitive prices for Harley-brand Compatible Parts.

61.     Plaintiff's claims all arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class that Plaintiff seeks to represent. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

62.     The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

63.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

64.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Alabama Code §§ 6-5-60 et seq.
### (On Behalf of the Alabama Class)

65.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

66.     Alabama Class members purchased Harley-Davidson Compatible Parts within Alabama during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

67.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Alabama.

17

68.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Alabama, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

69.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Alabama.

70.     As a direct and proximate result of Defendant's unlawful conduct, members of the Alabama Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

### COUNT II
**Arizona Rev. Stat. §§ 44-1401 et seq.**
**(On Behalf of the Arizona Class)**

71.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

72.     Arizona Class members purchased Harley-Davidson Compatible Parts within Arizona during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

73.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arizona.

74.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

75.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Arizona.

76.     As a direct and proximate result of Defendant's unlawful conduct, members of the Arizona Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT III**
**Arkansas Deceptive Trade Practices Act**
**Arkansas Code § 4-88-101 et seq.**
**(On Behalf of the Arkansas Class)**

77.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

78.     Arkansas Class members purchased Harley-Davidson Compatible Parts within Arkansas during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

79.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arkansas.

80.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

81.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Arkansas.

82.     As a direct and proximate result of Defendant's unlawful conduct, members of the Arkansas Class have been injured in their business or property and are threatened with further

injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT IV
### California Business and Professions Code §§ 16720, 16750
### (On Behalf of the California Class)

83.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

84.     California Class members purchased Harley-Davidson Compatible Parts within California during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

85.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within California.

86.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

87.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in California.

88.     As a direct and proximate result of Defendant's unlawful conduct, members of the California Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT V
### District of Columbia Code Ann. §§ 28-4501 et seq.
### (On Behalf of the District of Columbia Class)

89.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

90.     District of Columbia Class members purchased Harley-Davidson Compatible Parts within the District of Columbia during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

91.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within the District of Columbia.

92.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

93.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in the District of Columbia.

94.     As a direct and proximate result of Defendant's unlawful conduct, members of the District of Columbia Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201(2), et seq.**
**(On Behalf of the Florida Class)**

95.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

96.     Florida Class members purchased Harley-Davidson Compatible Parts within Florida during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

97.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Florida.

98.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Florida, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

99.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Florida.

100.    As a direct and proximate result of Defendant's unlawful conduct, members of the Florida Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT VII
### Hawaii Antitrust Act
### Haw. Rev. Stat. § 480-1, et seq.
### (On Behalf of the Hawaii Class)

101.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

102.    Hawaii Class members purchased Harley-Davidson Compatible Parts within Hawaii during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

103.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Hawaii.

104.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Hawaii, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

105.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Hawaii.

106.    As a direct and proximate result of Defendant's unlawful conduct, members of the Hawaii Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT VIII**
**Illinois Antitrust Act**
**740 Ill. Comp. Stat. Ann. 10/3(1), et seq.**
**(On Behalf of the Illinois Class)**

107.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

108.    Illinois Class members purchased Harley-Davidson Compatible Parts within Illinois during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

109.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Illinois.

110.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

111.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Illinois.

112.    As a direct and proximate result of Defendant's unlawful conduct, members of the Illinois Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT IX
### Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. Ann. 505/10a, et seq.
### (On Behalf of the Illinois Class)

113. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

114. Illinois Class members purchased Harley-Davidson Compatible Parts within Illinois during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

115. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Illinois.

116. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

117. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Illinois.

118. As a direct and proximate result of Defendant's unlawful conduct, members of the Illinois Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT X
## Iowa Code §§ 553.1 et seq.
## (On Behalf of the Iowa Class)

119.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

120.    Iowa Class members purchased Harley-Davidson Compatible Parts within the Iowa during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

121.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Iowa.

122.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Iowa, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

123.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Iowa.

124.    As a direct and proximate result of Defendant's unlawful conduct, members of the Iowa Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XI
### Kansas Stat. Ann §§ 50-101 et seq.
### (On Behalf of the Kansas Class)

125.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

126.    Kansas Class members purchased Harley-Davidson Compatible Parts within the Kansas during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

127.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Kansas.

128.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Kansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

129.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Kansas.

130.    As a direct and proximate result of Defendant's unlawful conduct, members of the Kansas Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XII
### Maine Monopolies and Profiteering Law
### Me. Rev. Stat. tit. 10, § 1101 et seq.
### (On Behalf of the Maine Class)

131. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

132. Maine Class members purchased Harley-Davidson Compatible Parts within Maine during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

133. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Maine.

134. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Maine, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

135. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Maine.

136. As a direct and proximate result of Defendant's unlawful conduct, members of the Maine Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XIII**
**Massachusetts Consumer Protection Law**
**Mass. Gen. Laws Chapter 93A**
**(On Behalf of the Massachusetts Class)**

137. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

138. Massachusetts Class members purchased Harley-Davidson Compatible Parts within Massachusetts during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

139. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Massachusetts.

140. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

141. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Massachusetts.

142. As a direct and proximate result of Defendant's unlawful conduct, members of the Massachusetts Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**Michigan Compiled Laws Ann. §§ 445.771 et seq.**
**(On Behalf of the Michigan Class)**

143.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

144.    Michigan Class members purchased Harley-Davidson Compatible Parts within Michigan during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

145.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Michigan.

146.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Michigan, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

147.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Michigan.

148.    As a direct and proximate result of Defendant's unlawful conduct, members of the Michigan Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XV
## Minnesota Ann. Stat. §§ 325D.49 et seq.
## (On Behalf of the Minnesota Class)

149.   The allegations in the preceding paragraphs are incorporated as if fully stated herein.

150.   Minnesota Class members purchased Harley-Davidson Compatible Parts within Minnesota during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

151.   Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Minnesota.

152.   Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Minnesota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

153.   Defendant's unlawful conduct substantially affected intrastate trade and commerce in Minnesota.

154.   As a direct and proximate result of Defendant's unlawful conduct, members of the Minnesota Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XVI**
**Mississippi Code Ann. §§ 75-21-1 et seq.**
**(On Behalf of the Mississippi Class)**

155.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

156.     Mississippi Class members purchased Harley-Davidson Compatible Parts within Mississippi during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

157.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Mississippi.

158.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

159.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Mississippi.

160.     As a direct and proximate result of Defendant's unlawful conduct, members of the Mississippi Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XVII**
**Missouri Merchandising Practices Act**
**Mo. Stat. §§ 407.010 et seq.**
**(On Behalf of the Missouri Class)**

161. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

162. Missouri Class members purchased Harley-Davidson Compatible Parts within the Missouri during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

163. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Missouri.

164. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Missouri, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

165. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Missouri.

166. As a direct and proximate result of Defendant's unlawful conduct, members of the Missouri Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

# COUNT XVIII
## Montana Unfair Trade Practices and Consumer Protection Act
## Mont. Code §§ 30-14-101, et seq.
## (On Behalf of the Montana Class)

167. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

168. Montana Class members purchased Harley-Davidson Compatible Parts within the Montana during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

169. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Montana.

170. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Montana, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

171. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Montana.

172. As a direct and proximate result of Defendant's unlawful conduct, members of the Montana Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XIX
## Nebraska Rev. Stat. §§ 59-801 et seq.
## (On Behalf of the Nebraska Class)

173.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

174.     Nebraska Class members purchased Harley-Davidson Compatible Parts within Nebraska during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

175.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Nebraska.

176.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Nebraska, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

177.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Nebraska.

178.     As a direct and proximate result of Defendant's unlawful conduct, members of the Nebraska Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XX
## Nevada Rev. Stat. Ann. §§ 598A.010 et seq.
## (On Behalf of the Nevada Class)

179.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

180.     Nevada Class members purchased Harley-Davidson Compatible Parts within Nevada during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

181.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Nevada.

182.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

183.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Nevada.

184.     As a direct and proximate result of Defendant's unlawful conduct, members of the Nevada Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XXI**
**New Hampshire Rev. Stat. §§ 356:1 et seq.**
**(On Behalf of the New Hampshire Class)**

185.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

186.    New Hampshire Class members purchased Harley-Davidson Compatible Parts within New Hampshire during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

187.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within New Hampshire.

188.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within New Hampshire, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

189.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in New Hampshire.

190.    As a direct and proximate result of Defendant's unlawful conduct, members of the New Hampshire Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XXII**
**New Mexico Stat. Ann. §§ 57-1-1 et seq.**
**(On Behalf of the New Mexico Class)**

191.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

192.    New Mexico Class members purchased Harley-Davidson Compatible Parts within New Mexico during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

193.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within New Mexico.

194.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

195.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in New Mexico.

196.    As a direct and proximate result of Defendant's unlawful conduct, members of the New Mexico Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXIII
### The Donnelly Act, New York General Bus. Law §§ 340 et seq.
### (On Behalf of the New York Class)

197.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

198.     New York Class members purchased Harley-Davidson Compatible Parts within New York during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

199.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within New York.

200.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within New York, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

201.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in New York.

202.     As a direct and proximate result of Defendant's unlawful conduct, members of the New York Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXIV
## North Carolina General Stat. §§ 75-1 et seq.
## (On Behalf of the North Carolina Class)

203.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

204.    North Carolina Class members purchased Harley-Davidson Compatible Parts within North Carolina during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

205.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within North Carolina.

206.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within North Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

207.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in North Carolina.

208.    As a direct and proximate result of Defendant's unlawful conduct, members of the North Carolina Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**North Dakota Century Code §§ 51-08.1-01 et seq.**
**(On Behalf of the North Dakota Class)**

209.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

210.    North Dakota Class members purchased Harley-Davidson Compatible Parts within North Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

211.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within North Dakota.

212.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

213.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in North Dakota.

214.    As a direct and proximate result of Defendant's unlawful conduct, members of the North Dakota Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXVI
### Oregon Revised Statutes §§ 646.705 et seq.
### (On Behalf of the Oregon Class)

215. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

216. Oregon Class members purchased Harley-Davidson Compatible Parts within Oregon during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

217. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Oregon.

218. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

219. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Oregon.

220. As a direct and proximate result of Defendant's unlawful conduct, members of the Oregon Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXVII
### Rhode Island Antitrust Act, Rhode Island Gen. Law §§ 6-36-1 et seq.
### (On Behalf of the Rhode Island Class)

221.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

222.    Rhode Island Class members purchased Harley-Davidson Compatible Parts within Rhode Island during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

223.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Rhode Island.

224.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Rhode Island, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

225.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Rhode Island.

226.    As a direct and proximate result of Defendant's unlawful conduct, members of the Rhode Island Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXVIII
### South Carolina Unfair Trade Practices Act
### S.C. Code Ann. §§ 39-5-10, *et seq.*
### (On Behalf of the South Carolina Class)

227. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

228. South Carolina Class members purchased Harley-Davidson Compatible Parts within South Carolina during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

229. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within South Carolina.

230. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within South Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

231. Defendant's unlawful conduct substantially affected intrastate trade and commerce in South Carolina.

232. As a direct and proximate result of Defendant's unlawful conduct, members of the South Carolina Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXIX
### South Dakota Codified Laws §§ 37-1-3.1 et seq.
### (On Behalf of the South Dakota Class)

233. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

234. South Dakota Class members purchased Harley-Davidson Compatible Parts within South Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

235. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within South Dakota.

236. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within South Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

237. Defendant's unlawful conduct substantially affected intrastate trade and commerce in South Dakota.

238. As a direct and proximate result of Defendant's unlawful conduct, members of the South Dakota Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XXX**
**Tennessee Code Ann. §§ 47-25-101 et seq.**
**(On Behalf of the Tennessee Class)**

239.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

240.     Tennessee Class members purchased Harley-Davidson Compatible Parts within Tennessee during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

241.     Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Tennessee.

242.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Tennessee, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

243.     Defendant's unlawful conduct substantially affected intrastate trade and commerce in Tennessee.

244.     As a direct and proximate result of Defendant's unlawful conduct, members of the Tennessee Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXXI
## Utah Code Ann. §§ 76-10-3101 et seq.
## (On Behalf of the Utah Class)

245. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

246. Utah Class members purchased Harley-Davidson Compatible Parts within Utah, and resided in Utah, during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

247. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Utah.

248. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

249. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Utah.

250. As a direct and proximate result of Defendant's unlawful conduct, members of the Utah Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XXXII**
**Vermont Stat. Ann. §§ 2453 et seq.**
**(On Behalf of the Vermont Class)**

251.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

252.    Vermont Class members purchased Harley-Davidson Compatible Parts within Vermont during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

253.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Vermont.

254.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

255.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in Vermont.

256.    As a direct and proximate result of Defendant's unlawful conduct, members of the Vermont Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

## COUNT XXXIII
## West Virginia Code §§ 47-18-1 et seq.
## (On Behalf of the West Virginia Class)

257.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

258.    West Virginia Class members purchased Harley-Davidson Compatible Parts within West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

259.    Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within West Virginia.

260.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

261.    Defendant's unlawful conduct substantially affected intrastate trade and commerce in West Virginia.

262.    As a direct and proximate result of Defendant's unlawful conduct, members of the West Virginia Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**COUNT XXXIV**
**Wisconsin Stat. §§ 133.01 et seq.**
**(On Behalf of the Wisconsin Class)**

263. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

264. Wisconsin Class members purchased Harley-Davidson Compatible Parts within Wisconsin during the Class Period. But for Defendant's conduct set forth herein, the price of the Compatible Parts would have been lower.

265. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Wisconsin.

266. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Wisconsin, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

267. Defendant's unlawful conduct substantially affected intrastate trade and commerce in Wisconsin.

268. As a direct and proximate result of Defendant's unlawful conduct, members of the Wisconsin Class have been injured in their business or property and are threatened with further injury in that they paid supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

269. Plaintiffs demand judgment against Defendant as follows:

    a. The Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), appoint

Plaintiff as Class Representative, and his counsel of record as Class Counsel, and direct that a practicable time notice of this action be given to the Class.

b. Judgment that Defendant's conduct violates the state laws asserted in this Complaint, which permit indirect purchasers to cover damages for antitrust violations.

c. Plaintiff and the Class recover damages to the maximum amount allowed by law.

d. Plaintiff recover reasonable attorneys' fees and costs as allowed by law.

e. Plaintiff recover pre- and post-judgment interest at the highest rate allowed by law.

f. Plaintiff and the Class be granted such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

270. Plaintiff demands a trial by jury as to all matters so triable.


Dated: November 18, 2022

*/s/Arthur N. Bailey*
Arthur N. Bailey
**RUPP BAASE PFALZGRAF**
  **CUNNINGHAM LLC**
111 West 2nd Street #1100
Jamestown, NY 14701
(716) 854-3400
bailey@ruppbaase.com

Marco Cercone, Esq.
**RUPP BAASE PFALZGRAF**
  **CUNNINGHAM LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
(716) 854-3400
cercone@ruppbaase.com

W. Joseph Bruckner (*pro hac vice* forthcoming)
Heidi M. Silton (*pro hac vice* forthcoming)
Jessica N. Servais (*pro hac vice* forthcoming)
Joseph C. Bourne (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
wjbruckner@locklaw.com
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

***Counsel for Plaintiff and the Proposed Class***